UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ELIZABETH CHOUINARD,
DENNIS CHOUINARD,
    Plaintiffs,

v.

MARIGOT BEACH CLUB AND
DIVE RESORT,
MARIGOT ESCAPES, LIMITED,
MARIGOT INN, LIMITED, and
DAVID SHIMELD,
    Defendants.

CIVIL ACTION NO. 20-10863-MPK[1]

MEMORANDUM AND ORDER ON DEFENDANTS'
RENEWED MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION
AND IMPROPER VENUE (#43).

I. <u>Introduction</u>.

This case raises the question of whether this court has personal jurisdiction over a resort and its director, in St. Lucia, after a resident of Massachusetts was injured while vacationing there. Elizabeth Chouinard and her sister-in-law, Jodie Anthony, were staying at Marigot Beach Club and Dive Resort when, on February 16, 2018, Elizabeth fell in the hot tub area. Elizabeth and her husband, Dennis, brought suit in this court on May 6, 2020, alleging negligence, failure to warn, and loss of consortium. (#1.)[2] Defendants moved to dismiss for lack of personal jurisdiction and

---

[1] The parties have consented to proceeding before this court for all purposes, pursuant to 28 U.S.C. § 636(c). (#16.)

[2] The complaint names as defendants Marigot Beach Club and Dive Resort (the Resort); Marigot Escapes, Limited; Marigot Inn, Limited (Marigot Inn); and, David Shimeld, managing director of the Resort at the time of the accident. Defendants have maintained that neither the Resort nor Marigot Escapes, Limited are properly named. Marigot Inn operates the Resort. *See generally* ##8-2, 44-3. The court will simply refer to "the Resort."

improper venue. (##7, 8.) Plaintiffs opposed, arguing, in part, that they should be allowed to conduct discovery on jurisdiction. (#18.)

In a lengthy Memorandum and Order issued on June 3, 2021, the court ruled that plaintiffs had not satisfied their burden on the "relatedness" prong of the constitutional inquiry concerning specific personal jurisdiction but allowed them to conduct discovery on the issue. (#20 at 21-24, 26.) Familiarity with the court's earlier Memorandum and Order is presumed.

The court initially set a three-month period for jurisdictional discovery, *see* #20 at 26, however, discovery remained open for almost a year, *see* ##22, 24, 28, 32, 36, 40. At the close of discovery, defendants renewed the motion to dismiss. (##43, 44, 52.) Plaintiffs opposed. (#49.) As explained below, the renewed motion to dismiss is granted.

II. Standard of Review.

Plaintiffs bear the burden of establishing that the court may properly exercise personal jurisdiction over defendants. *Chen v. U.S. Sports Acad., Inc.*, 956 F.3d 45, 54 (1st Cir. 2020). To determine whether plaintiffs have met their burden, the court chooses the prima facie method, *see* #20 at 2, asking whether plaintiffs have "proffered evidence that, if credited, is enough to support findings of all facts essential to personal jurisdiction." *Foster-Miller, Inc. v. Babcock & Wilcox Canada*, 46 F.3d 138, 145 (1st Cir. 1995) (citation and punctuation omitted); *see Vapotherm, Inc. v. Santiago*, 38 F.4th 252, 256-257 (1st Cir. 2022) (prima facie method employed after jurisdictional discovery); *Hamilton v. Young Mgmt., LLC*, --- F. Supp. 3d ---, No. 22-CV-11307-PBS, 2022 WL 17736915, at *1-2 (D. Mass. Dec. 16, 2022) (same).

The court must accept plaintiffs' properly documented evidentiary proffers as true and "give credence to [their] version of genuinely contested facts." *Chen*, 956 F.3d at 54 (citation and

2

punctuation omitted); *see Foster-Miller*, 46 F.3d at 145. If undisputed, the court also considers defendants' properly documented evidentiary proffers. *Chen*, 956 F.3d at 54, 56.

Even the prima facie method "does not require that [the court] credit conclusory allegations or draw farfetched inferences." *Vapotherm, Inc.*, 38 F.4th at 257 (citation and punctuation omitted). Plaintiffs' burden may be "light," but they still must point to specific facts in the record. *Id.* (citations omitted).

### III. Facts Relevant to the "Relatedness" Prong.

#### A. The Reservation.

In late December 2017, Elizabeth and Jodie decided to take a trip to the Caribbean. Jodie was an avid scuba diver, and the sisters-in-law were interested in resorts that offered diving. (#49-4 (affidavit of Elizabeth Chouinard) at ¶¶2-3; #49-9 (affidavit of Jodie Anthony) at ¶¶2-3.)[3] Elizabeth and Jodie ". . .conducted research on the internet. . . ." (#49-4 at ¶4; #49-9 at ¶4.) Elizabeth attests that they "came upon" the Resort, "which targeted divers," *see* #49-4 at ¶4, while Jodie attests that they "decided upon" the Resort, "which targeted divers," *see* #49-9 at ¶4.

Based on "the targeted marketing" and "information" on the website, Elizabeth and Jodie made a reservation at the Resort, from February 15-22, 2018. (#49-4 at ¶5; #49-9 at ¶5.) The reservation was made on January 4, 2018. (#49-4 at ¶6; #49-9 at ¶6.) It was not made on the Resort's website; it was made through Expedia, which "was cheaper." (#49-4 at ¶¶6-7; #49-9 at ¶¶6-7); *see* #49-5 at 2-3 (reservation), #49-6 at 26-27 (Expedia email).

---

[3] Elizabeth's affidavit submitted with plaintiffs' opposition to defendants' renewed motion is identical to her affidavit submitted with plaintiffs' opposition to defendants' initial motion. *Compare* #18-2 *with* #49-4. The court cites to #49-4. Jodie's affidavit, *see* #49-9, is newly submitted in opposition to the renewed motion.

B. <u>Post-Reservation Communications</u>.

Elizabeth attests that, "[a]fter the reservation was made," she and Jodie communicated directly with the Resort about the trip via telephone, email, and fax on January 20, 22, 23, 24, 25 and February 19, 2018. (#49-4 at ¶8.) The communications were related to the purchase of additional services from the Resort. *Id*. The Resort required Elizabeth to complete a credit card authorization form, which Elizabeth did on January 23, 2018, and then sent to the Resort. *Id*. at ¶9; *see* #49-7 at 2 (form).

Jodie also attests that, "[a]fter the reservation was made," she and Elizabeth communicated directly with the Resort via telephone, email, and fax from January 20 to February 2018 about the purchase of additional services. (#49-9 at ¶8.)

Exhibits E and G to plaintiffs' new submission include emails between Elizabeth and the Resort, *see* #49-6 at 2-10; emails between Jodie and the Resort,[4] with two invoices, *see* #49-6 at 11-25; and emails between Jake Chouinard, Elizabeth's son, and the Resort, *see* #49-8 at 2.

On January 17, 2018, Jake wrote to the Resort explaining that his mother would be staying there and expressing interest in purchasing a gift card for her to use for spa or group wellness activities. Jake asked whether that was possible and, if so, how to complete the purchase. The Resort responded with thanks and by providing a link for the spa treatments that were available. (#49-8 at 2.)

On January 20, Elizabeth wrote to "info@marigotbeachclub.com" introducing herself and explaining that she would be staying at the Resort. She expressed interest in booking spa treatments

---

[4] In a footnote in their reply brief, defendants assert that plaintiffs did not disclose the emails between Jodie and the Resort in discovery and "therefore, they are not part of the record before this Court." (#52 at 2 n.1.) The court considers the emails because this is not the proper way to raise alleged discovery violations and, regardless, the emails do not alter the court's ruling.

and excursions and asked how and when those additional services could be booked. Elizabeth identified the spa treatments and excursions. She also asked about transportation. (#49-6 at 2-3.)

On January 22, the Resort responded with thanks and indicating a willingness to assist, but needed more information about the reservation. Later that day, Elizabeth responded that the reservation was made through Expedia and would be under Jodie's name. (#49-6 at 4.)

Between January 22 and January 24, Elizabeth and the Resort exchanged several more emails working out the details on, *inter alia*, the spa treatments and excursions. (#49-6 at 6-9.) It is clear that the Resort booked the spa treatment and excursions on Elizabeth's behalf based on these emails. *See*, *e.g.*, #49-6 at 9 ("The regular facials have been booked. . .Rainforest Adventure – Booked Soufriere Adventure – Booked").

In one of the emails, Elizabeth explained that the vacation coincided with the one year anniversary of her brother's passing, and that she was trying to plan a nice trip for Jodie. (#49-6 at 8.) The Resort extended condolences, and stated: "We will do our best to ensure that you have a great stay here." *Id*. at 9.

On January 24, Elizabeth responded with thanks; specified the time for the spa treatments (the mornings of February 16 and 18); and, stated that Jodie would like to go scuba diving, as well. Elizabeth asked whether dives should be booked in advance or whether they could be booked after arrival. (#49-6 at 10); *see* #49-6 at 8-9.

On January 28, Jodie wrote to "info@marigotbeachclub.com" introducing herself and explaining that she would be staying at the Resort. She expressed interest in scuba diving. She asked whether she had to book the dives in advance or whether she could book them after arrival. She wanted flexibility with the dives since she and Elizabeth had already booked excursions. (#49-6 at 22.)

5

Later that day, the Resort responded with excitement, and recommended that Jodie book at least one or two dives before arrival. (#49-6 at 21-22.)

Between January 28 and February 6, Jodie and the Resort exchanged several more emails working out the details of the dives. (#49-6 at 15-21.) It is clear that the Resort scheduled dives on Jodie's behalf based upon these emails, although Jodie did not pay at that time. *Id*. at 16 ("I can confirm your booking for two morning dives for Monday February 19th. When you check in, you can visit our dive shop if you have any queries about your dives. The charges will be placed on your room and can be paid on check out").

The morning of February 16, Jodie received a welcome email from the Resort's general manager, Lorne Charles. (#49-6 at 11-12.)

### C. The Accident.

Elizabeth and Jodie arrived at the Resort on February 15, 2018. (#49-4 at ¶10; #49-9 at ¶9.) In her affidavit, Elizabeth does not describe the fall beyond attesting that on the evening of February 16, she "was injured on an unmarked and dark entrance to the sauna and jacuzzi," *see* #49-4 at ¶11, resulting in multiple fractures of her pelvis, right elbow and arm, and a concussion, *see id*. at ¶10, and necessitating a return to Boston, on February 19, for medical treatment, including surgery, *see id*. at ¶¶12-13. Elizabeth was out of work as a dental hygienist until May 2018. *Id*. at ¶14. Photos of the area of the hot tub are in the record. (#49-10 at 2-4; #18-1 at 27-29.)

Jodie's newly-submitted affidavit adds:

> The following evening, February 16, 2018, we decided to explore the resort to determine the location of other resort amenities and departure points for excursions which we had previously purchased and booked while in Massachusetts. We were particularly interested in seeing the shop, since we had planned several dives.

6

>I made inquiry at the front desk, and we were directed to the rear of the resort as well as the location of the hot tub and sauna. We were not advised that the hot tub was empty, unguarded and represented a hazard.
>
>Elizabeth was injured when she fell on an unmarked and dark entrance to the sauna and hot tub.

(#49-9 at ¶¶10-12.)

### D. Post-Accident Communications.

On February 19, the Resort sent Jodie an invoice for a spa treatment. (#49-6 at 13.) Only a portion of an apparent response to this email is in the record. The date and sender have been cutoff. Presumably, however, Jodie wrote to the Resort regarding her understanding that "the people from the zipline adventure were going to charge" her and Elizabeth "half of the price of the excursion," and asked follow-up questions. *Id*.

There are two Resort invoices in the record, both addressed to Jodie, in Massachusetts, and both dated February 17. One involves a spa treatment charge on February 16, and the other a restaurant charge on February 16. (#49-6 at 24-25.)

No other post-accident communications between plaintiffs or Jodie and the Resort are in the record.

### E. Evidence Regarding the Resort's Website and Advertising.

In its earlier Memorandum and Order, the court observed that plaintiffs had submitted some pages of the Resort's website with a 2020 copyright date, i.e. a version apparently post-dating the accident by two years. (#20 at 5 n.4, 18 n.15); *see* #18-1 (2020 website) at 2-7. With their opposition to defendants' renewed motion to dismiss, plaintiffs have submitted some pages of the

Resort's website with a 2022 copyright date, i.e., a version apparently post-dating the accident by four years. *See*, *e.g.*, #49-2 (2022 website) at 3.[5]

Notwithstanding the date issues, the court accepts Elizabeth's and Jodie's attestations that the Resort's website, before the accident, "permit[ed] direct reservations as well as on-line chatting." (#49-4 at ¶6; #49-9 at ¶6.) It will assume, favorably to plaintiffs, that the Resort's website in 2017-2018 was similar to the website in 2020 and 2022.

According to the Resort's interrogatory responses submitted by plaintiffs, at the time of the accident, the Resort's website was hosted by Go Daddy and maintained by Booking Suite through www.booking.com. Presently, the Resort's website is hosted and maintained by Social Caddie. (#49-11 at 5.)[6]

Since 2016, the Resort has also had a relationship with Travel Tripper "for website purposes." (#49-11 at 4); *see* #49-12 (2016 Travel Tripper agreement) at 8-11.[7]

The Resort's 2020 and 2022 website provides a physical address, telephone number, and email address ("info@marigotbeachclub.com"). *See*, *e.g.*, #18-1 at 2; #49-2 at 18. There is also a page on which to submit a "General Inquiry." (#18-1 at 4; #49-2 at 17.)

Plaintiffs' new submission shows that the Resort's 2022 website describes excursions, including for scuba diving, and spa treatments, *see*, *e.g.*, #49-2 at 9-10, 12, 14; however, it is not

---

[5] The court's jurisdictional analysis should generally be limited to contacts "before and surrounding the accrual date of the cause of action." *Harlow v. Children's Hosp.*, 432 F.3d 50, 61 (1st Cir. 2005).

[6] Presently, the Resort has a relationship with Social Caddie "for marketing purposes," but they did not have this relationship at the time of the accident. (#49-11 at 4, 5); *see also* #49-13 (excerpts of Charles' deposition testimony submitted by plaintiffs) at 14; #49-12 (2021-2022 Social Caddie invoices) at 12-14.

[7] In its answers to interrogatories, the Resort also described Travel Tripper as a "third party travel website[]" with which the Resort had a "marketing relationship" through which the Resort might arguably be said to advertise. (#49-11 at 3.)

apparent that excursions and spa treatments could be scheduled or purchased there, *see, e.g., id*. at 14 ("Soothing Touch Spa is open daily from 9Am-5Pm. We recommend that you book your sessions in advance to avoid disappointment – please send us an email with your preferred dates and times and we'll do the rest").

The record establishes that the Resort had, at the relevant time, a relationship with Expedia, and that is how Elizabeth and Jodie made their own reservation. (#49-4 at ¶¶6-7; #49-9 at ¶¶6-7.) The relationship with Expedia is confirmed by the Resort's answers to interrogatories, in which defendant stated that Expedia is a "third party travel website[]" with which it has a "marketing relationship" through which it might arguably be said to advertise. (#49-11 at 3.) The relationship with Expedia is further confirmed by Charles' deposition testimony. (#49-13 at 16.)

Moreover, Trip Advisor's logo appears on pages of the 2020 and 2022 website, along with a review by a United Kingdom-based guest, posted through www.tripadvisor.com. (#18-1 at 2; #49-2 at 3, 6, 8, 11, 16, 18.)

In response to interrogatories, the Resort further indicated that the Resort has a "marketing relationship" through which the Resort might arguably be said to advertise with Travelocity, another "third party travel website[]." (#49-11 at 3.)

In response to interrogatories, the Resort also indicated that the Resort has a "marketing relationship" through which the Resort might arguably be said to advertise with British Airways, as well as Caradonna Adventures. (#49-11 at 3); *see* #49-12 (2020-2021 British Airways contract) at 16-21; *see also* #49-12 (2020-2021 Caradonna Adventures agreement) at 22-26. Caradonna Adventures, in particular, agreed to feature the Resort in its brochure. (#49-12 at 25.)

Beyond third-party accounts with travel websites, it is apparent from pages of the 2022 website that the Resort has social media accounts, including Pinterest, Facebook, Instagram,

9

Twitter, and YouTube. *See*, *e.g.*, #49-2 at 18. That the Resort has social media accounts is confirmed by the Resort's answers to interrogatories, *see* #49-11 at 3-4, as well as Charles' deposition testimony, *see* #49-13 at 8-9. Charles testified that both he and Social Caddie do social media marketing for the Resort and that the Resort has paid for social media marketing by Facebook and Instagram. *Id*. at 11-13. Previously, the Resort also paid for Google Adwords. *Id*. at 14. The Resort does not presently pay for Google Adwords because of "[b]udget constraints." *Id*.

It is apparent that the Resort has a newsletter, by subscription. (#18-1 at 2; #49-2 at 18.) When deposed, Charles denied knowledge of whether the Resort did "e-mail marketing." (#49-13 at 10.)

Plaintiffs have submitted a Cookie notice, with "Effective Date: April 2018." (#49-3 at 2-4.)[8] The court will assume, favorably to them, that the Cookie notice, or something similar, was effective before the accident.

The Cookie notice provides, in relevant part:

When entering the Site or viewing our targeted advertisements, we automatically collect data using Cookies.

The types of information that we collect through Cookies include IP address; device ID; viewed pages; browsing information; browser type; operating system; internet service provider; timestamp, the referring URL; and location data depending on the device you use.

(#49-3 at 2.)

The Cookie notice also provides:

We use your information, including personal data, collected through Cookies for the following purposes:
…
C. Providing targeted advertisements: We use information that we collect through Cookies to pursue our legitimate interests by providing targeted advertising. Where necessary, we will obtain prior consent before Cookies are placed for this purpose.

---

[8] Plaintiffs submitted a Cookie notice previously, *see* #18-1 at 5-7, and the court noted the belated effective date in its earlier Memorandum and Order, *see* #20 at 5 n.4.

> If consent is given, you can withdraw it at any time. In addition, you can object to our processing of your personal data for advertising purposes at any time.
> …

(#49-3 at 2-3.)

At his deposition, Charles denied that the Resort targets Massachusetts or Massachusetts-based customers with advertising. (#49-13 at 19-20); *see* #44-4 (excerpt of Charles' deposition testimony submitted by defendants) at 4-6. Charles denied having any information that Social Caddie used the Cookie data to target Massachusetts-based customers with advertising and testified that Social Caddie would have given him that information if they did, "but they don't." (#44-4 at 6-7.) Charles did not know why the Cookie notice appears on the website or who allegedly collects that data. *Id*. at 7-8.

Shimeld has also attested that defendants "have never directed any specific advertisements in the Massachusetts marketplace." (#44-3 at ¶27.) The pages of the 2020 and 2022 websites submitted by plaintiffs do not mention Massachusetts or its residents. (#18-1 at 2-7; #49-2 at 2-18.)

In response to interrogatories, the Resort answered that it was unable to determine the amount of revenue that it received from Massachusetts-based customers. (#49-11 at 5, 6.) Charles testified that the Resort does not maintain data pertaining to the amount of revenue received from Massachusetts-based customers. He further explained that when customers book through, e.g. Expedia, the Resort receives names, check-in and check-out dates, and rates, but not physical or email addresses. (#49-13 at 18.)

Charles testified that, now, about twenty-five percent of the Resort's customers are from the United States. In 2018, however, more of the Resort's customers were from the United States.

11

(#49-13 at 15.) At least in the excerpts of his deposition testimony submitted by the parties, Charles did not approximate how many more.

### IV. Relevant Law.

Subject matter jurisdiction in this case is based on diversity of citizenship, *see* 28 U.S.C. § 1332(a)(2). (#1 at ¶8.) Plaintiffs therefore bear the burden of establishing that the court's exercise of personal jurisdiction over defendants comports with the Massachusetts Long-Arm Statute, Mass. Gen. Laws ch. 223A, § 3, and the Due Process Clause of the Fourteenth Amendment. *Nandjou v. Marriott Int'l Inc.*, 985 F.3d 135, 148 (1st Cir. 2021); *Nowak v. Tak How Invest., Ltd.*, 94 F.3d 708, 712-713 (1st Cir. 1996). Because the court finds, again, that plaintiffs have not satisfied their constitutional burden, the court does not address the statutory requirements. *See Motus, LLC v. CarData Consultants, Inc.*, 23 F.4th 115, 124 (1st Cir. 2022).[9]

For the court's exercise of personal jurisdiction to be constitutional, defendants must have such "contacts" with Massachusetts that maintenance of the suit here is "reasonable" and "does not offend traditional notions of fair play and substantial justice." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, --- U.S. ---, 141 S.Ct. 1017, 1024 (2021) (punctuation omitted) (*quoting Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316-317 (1945)). Plaintiffs have asserted specific personal jurisdiction over defendants. (#49 at 25.)[10] The due process inquiry thus has three prongs: relatedness, purposeful availment, and reasonableness. *Vapotherm, Inc.*, 38 F.4th at 258-263; *see Nandjou*, 985 F.3d at 148; *Nowak*, 94 F.3d at 712-713. Plaintiffs must satisfy all three prongs, and

---

[9] The court addressed the Massachusetts Long-Arm Statute in its earlier Memorandum and Order, and assumed, without deciding, that plaintiffs had satisfied their burden under Mass. Gen. Laws ch. 223A, § 3(a). (#20 at 7-9, 21 n.19.)

[10] The court found in its earlier Memorandum and Order that it could not properly exercise general personal jurisdiction over defendants. (#20 at 10 n.9.) Nothing in plaintiffs' new submission is to the contrary.

the court's analysis begins and ends with the first: relatedness. *See Motus, LLC*, 23 F.4th at 124, 126 n.5.[11]

Plaintiffs bring tort claims. (#1 at ¶¶21-28.) To satisfy the relatedness prong, then, they must show that the tort claims "arise out of or relate to" defendants' contacts with Massachusetts. *Vapotherm, Inc.*, 38 F.4th at 260 (alteration and punctuation omitted) (*quoting Ford Motor Co.*, 141 S.Ct. at 1026 (*quoting Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 582 U.S. 255, 262 (2017))); *see Rodríguez-Rivera v. Allscripts Healthcare Solutions, Inc.*, 43 F.4th 150, 160 (1st Cir. 2022); *contrast Vapotherm, Inc.*, 38 F.4th at 258-259 (for contract claims, defendants' contacts with Massachusetts must have been instrumental in formation or breach of contract). "[T]here must be an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Bristol-Myers Squibb Co.*, 592 U.S. at 262 (punctuation and citation omitted); *see Ford*, 141 S.Ct. at 1024.

A strict causal relationship between defendants' contacts with Massachusetts and the tort claims is not required. *Ford*, 141 S.Ct. at 1026; *accord Nandjou*, 985 F.3d 149; *Nowak*, 94 F.3d at 715. Yet, as the Supreme Court in *Ford* stated: "That does not mean anything goes. . . . [T]he phrase 'relate to' incorporates real limits, as it must to adequately protect defendants. . . ." *Ford*, 141 S.Ct. at 1026; *see Vapotherm, Inc.*, 38 F.4th at 261.

The United States Court of Appeals for the First Circuit has long recognized that although a strict causal relationship is not required, the link between the defendants' contacts with Massachusetts and the tort claims should nevertheless be, variably stated, meaningful, *see Nowak*, 94 F.3d at 716, important, or at least material, *see Harlow*, 432 F.3d at 61; *see also Hamilton*, 2022

---

[11] The court addressed the purposeful availment prong in its earlier Memorandum and Order, and assumed, without deciding, that plaintiffs had satisfied their burden. (#20 at 17-21.)

13

WL 17736915, at *5; *Ciolino v. Keystone Shipping Co.*, No. 21-CV-11246-DJC, 2022 WL 425680, at *5 (D. Mass. Feb. 11, 2022).

V. <u>Discussion</u>.

Plaintiffs' tort claims arise out of events that occurred entirely in St. Lucia, and the court cannot agree that defendants' proffered contacts with Massachusetts "relate to" those claims. The contacts are not sufficiently meaningful, important, or even material.

The Resort's own website and its pages on third-party travel websites are "on the internet for all the world to see." *See Nandjou*, 985 F.3d at 150. Any posts on Pinterest, Facebook, Instagram, Twitter, and YouTube are likewise "on the internet for all the world to see." The pages of the Resort's own website that plaintiffs have submitted do not refer to Massachusetts or its residents. Plaintiffs have not submitted the Resort's pages on third-party travel websites or presented social media posts. Thus, there is no evidence that, for example, the Resort's page on Expedia, Caradonna Adventure's brochure, if one exists, or some tweet by Charles, sought to cultivate business from Massachusetts and its residents specifically.

Defendants deny that the Resort targets Massachusetts or its residents with advertising. (#44-3 at ¶27; #44 at 6-7.) Plaintiffs' evidentiary proffer establishes the opportunity to target Massachusetts-based customers, not that Massachusetts-based customers were, in fact, targeted. *See Vapotherm, Inc.*, 38 F.4th at 257 (prima facie method does not require court to credit conclusory allegations or draw farfetched inferences). Even assuming for the sake of argument that the Resort targeted Massachusetts or its residents with advertising, there is no evidence that Elizabeth and Jodie ever saw such advertising or that it influenced them. They have both submitted affidavits, and neither attests to seeing advertising which targeted Massachusetts or its residents,

14

as opposed to the Resort's world-wide website. The Resort, they attest, "targeted divers." (#49-4 at ¶4; #49-9 at ¶4.)[12]

The post-reservation communications between Jake, Elizabeth, and Jodie and the Resort do not satisfy plaintiffs' constitutional burden. With the exception of Charles' welcome email to Jodie on the morning of February 16, *see* #49-6 at 11-12, the communications in the record were not initiated by the Resort. Jake emailed the resort about a gift card and the Resort responded. (#49-8 at 2.) Elizabeth emailed the Resort about spa treatments, excursions, and transportation and the Resort responded. (#49-6 at 2-10.) Jodie emailed the Resort about dives and the Resort responded. (#49-6 at 15-22.)[13] Contrary to plaintiffs' argument, *see* #49 at 26-30, these communications did not establish a business relationship like the one in *Nowak*, which was extensively negotiated between the decedent's husband's employer and the Holiday Inn, prior to the reservation and tragic drowning in that case. *See* 94 F.3d at 711, 715-717. Finally, these

---

[12] For this reason, among others, *see* #20 at 22 n.20, *Sigros v. Walt Disney World Co.*, 129 F. Supp. 2d 56 (D. Mass. 2001), on which plaintiffs rely, is readily distinguishable. *Id.* at 62, 67 (evidentiary proffers established that over the course of fifteen years, mother saw numerous advertisements for Walt Disney World, the Magic Kingdom, Epcot Center and/or MGM Studios and was influenced by those advertisements to book trip; finding that "it was reasonably foreseeable that advertising in Massachusetts for the Walt Disney World Resort would induce Massachusetts residents to make reservations at a Disney-owned hotel. More specifically, it was reasonably foreseeable from Disney/WDA's communications with [mother] that she and [daughter] would eat at restaurants located on the Caribbean Beach property, such as Captain's Tavern. Furthermore, Disney assured [mother] that handicapped-accessible facilities were available for [daughter] in their hotel room. By extension, it was surely foreseeable that a handicapped guest would use and might be injured by use of the wheelchair ramp at Captain's Tavern").

[13] The Resort apparently sent Jodie invoices post-accident. (#49-6 at 13, 24-25.) Plaintiffs develop no argument as to these communications and the court declines to find that such putative contact with Massachusetts suffices.

15

communications are not like *Nandjou*'s direct mailings to the plaintiff's and decedents' home that induced the reservation prior to the tragic drownings in that case. *See* 985 F.3d at 138, 150.[14]

Plaintiffs' evidentiary proffers show that Elizabeth and Jodie, in Massachusetts, conducted internet research and "came upon" the St. Lucia Resort's website, *see* #49-4 at ¶4; made the reservation through Expedia; and then made virtual requests pertaining to St. Lucia-based services that ultimately would have an exceedingly attenuated connection to the accident. The Resort responded to these requests, remotely. Plaintiffs point to no case in which a court has held that facts like these meet the "relatedness" prong.

The court is sympathetic to plaintiffs. Elizabeth is alleged to have sustained serious injuries on a vacation during what was surely a very sad time for her and Jodie. However, the court has carefully reviewed plaintiffs' new submission, which does not differ substantially from their previous submission despite the significant period for jurisdictional discovery. Based on that review and controlling law, the court grants the renewed motion to dismiss for want of personal jurisdiction. It would be fundamentally unfair to defendants to allow plaintiffs to maintain suit here. *See Nowak*, 94 F.3d at 716 (relatedness requirement allows court to take into account strength or weakness of plaintiffs' relatedness showing in assessing fundamental fairness of allowing the suit to proceed).

---

[14] The evidence in this case is also not like that which District Judge Saris recently held sufficed in *Hamilton*, which like this case involves tort claims but, unlike this case, also involves contract claims. *See* 2022 WL 17736915, at *2, *5 (plaintiffs, planning honeymoon, reviewed Fiji resort's website from home and saw email address for reservations manager at defendant-booking agent; plaintiffs sent email asking about stay and manager responded on March 29, 2017 advising of package involving complementary meals and quotes; manager responded with additional information on March 30, 31, April 3, 4 and sent booking forms on April 4, which were executed by plaintiffs in Massachusetts; evidentiary proffers established that, post-reservation, plaintiffs' email addresses were automatically entered into lists and they began receiving advertisements from booking agent about resort once or twice per month; from 2018-2020, at least five other Massachusetts residents received one to two dozen of these advertisements annually).

VI. <u>Conclusion</u>.

For the above reasons, defendants' renewed motion to dismiss (#43) is granted. The complaint is dismissed without prejudice. Separate order to issue.


March 31, 2023                                              <u>/s/ M. Page Kelley</u>
                                                            M. Page Kelley
                                                            Chief United States Magistrate Judge